1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11   EMMANUEL SALGADO, GAEL GROB,     )   Case No.: 1:17-cv-0339-JLT
     DAVID GARCIA, and ANDRE WONG     )
12   behalf of themselves and all other similarly )   ORDER GRANTING PLAINTIFFS'
     situated,                         )   MOTION FOR FINAL APPROVAL OF THE CLASS
13                                      )   ACTION SETTLEMENT AND GRANTING IN
                Plaintiffs,            )   PART THE REQUEST FOR FEES, COSTS, AND
14                                      )   ENHANCEMENT PAYMENTS
          v.                           )
15                                      )   (Doc. 62)
     T-MOBILE USA, INC., et al.,        )
16                                      )
                Defendants.            )
17   _____ )

18         Emmanuel Salgado, Gael Grob, David Garcia, and Andre Wong assert T-Mobile USA is liable

19   for violations of wage and hour laws are prosecuting this action on behalf of themselves and all other

20   similarly situated employees of T-Mobile.  Plaintiffs seek final approval of the class action settlement

21   reached with T-Mobile.  In addition, Plaintiffs seek attorney's fees and costs from the settlement fund,

22   costs for settlement administration, and enhancement payments for the class representatives. (Doc. 62)

23   Defendant does not oppose these requests, and no objections were filed by class members.

24         The Court finds the matters suitable for decision without oral arguments.  Therefore, the motion

25   is taken under submission pursuant to Local Rule 230(g) and General Order 618, and the hearing date

26   of June 8, 2020 is **VACATED**.

27         Because Plaintiffs carry the burden to demonstrate certification of the Settlement Class is

28   appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

                                                    1

fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  In addition, Plaintiffs' request for attorney fees is **GRANTED** in the modified amount of $**1,600,000.00**; costs are awarded in the amount of $**40,005.68**; and settlement administration costs are granted in the amount of $**56,000.00**.  Enhancement payments are **GRANTED** in the modified amounts of $7,500 for Emmanuel Salgado; $4,000 for David Garcia; and $1,000 each for Andre Wong and Gael Grob.

## BACKGROUND

Plaintiffs were employed as hourly-paid employees by T-Mobile USA, Inc.; T-Mobile US, Inc.; and MetroPCS Communications Inc.  (Doc. 50 at 3)  Plaintiffs worked in positions such as retail sales associates, mobile experts, sales leads, retail associate managers, and retail store managers.  (*Id.* at 4, ¶ 4)  According to Plaintiffs, their employers engaged in unlawful employment practices and:

  a.  Failed to pay overtime wages at the appropriate overtime pay rate;
  b.  Failed to pay straight time, minimum, overtime, and/or commission wages for all hours worked in a timely manner;
  c.  Failed to provide executed commission agreements;
  d.  Failed to provide all legally requisite meal periods;
  e.  Failed to authorize and permit all paid rest periods;
  f.  Failed to pay meal and/or rest premium wages at the legal pay rate;
  g.  Failed to reimburse for all work-related expenses;
  h.  Failed to pay all accrued paid time off pay;
  i.  Failed to maintain required records;
  j.  Failed to timely furnish accurate itemized wage statements;
  k.  Derivatively violated Labor Code §203;
  l.  Independently violated Labor Code §203;
  m.  Incurred penalties pursuant to Labor Code §§2698, et seq.; and
  n.  Conducted unfair business practices.

(Doc. 50 at 5-6, ¶ 11) (emphasis omitted).

According to Plaintiffs, putative class members were under the defendants' control and required to perform tasks without pay. (Doc. 50 at 20, ¶¶ 52-54) For example, Plaintiffs contend they were not compensated for "tasks [such] as responding to GroupMe texts, scheduling, picking up devices, making telephone calls, performing overrides/exchanges, submitting reports, management calls, and/or Small Business Prep."  (*Id.*, ¶ 52)  Plaintiffs contend this resulted in payment of "less than the legal minimum wage in the State of California."  (*Id.*, ¶ 53)

In addition, Plaintiffs allege they were not timely paid all wages—including commissions and vacation wages— due to former employees.  (*See* Doc. 50 at 5-6, 37-38)  According to Plaintiffs, the defendants had "a consistent and uniform policy, practice and procedure of willfully failing to pay the

earned wages of… former employees." (*Id.* at 36, ¶ 136)  For example, they report Emmanuel Salgado "was terminated on August 10, 2016," but "was not paid final wages, including final commissions, until September 30, 2016." (*Id.* at 38, ¶ 144)  Thus, Plaintiffs contend the defendants failed to pay putative class members "wages due and owing at the time of their termination and/or within seventy-two (72) hours of their resignation, and failed to pay those sums for up to thirty (30) days thereafter." (*Id.* at 37, ¶ 137; *see also id.* at 38, ¶ 145)

On February 3, 2017, Salgado filed a complaint on behalf of himself and others similarly situated for unlawful wage and hour practices against T-Mobile USA, Inc. in Kern County Superior Court, Case. No. BCV-17-100243. (Doc. 1 at 14) The defendant filed a Notice of Removal on March 8, 2017, thereby initiating the action in this Court. (Doc. 1)  Both prior to and following the filing of the *Salgado* action in Kern County Superior Court, "several related actions were filed in, or removed to, various other state and federal courts," including: *Garcia v. T-Mobile USA, Inc.*, filed on May 27, 2016 in Los Angeles Superior Court, Case No. KC068472 ("*Garcia*"); *Grob v. T-Mobile USA, Inc.*, filed on June 14, 2019, in the Central District of California, Case No. 2:19-cv-06352 ("*Grob*"); and *Wong v. T-Mobile USA, Inc.*, filed on January 29, 2019, in the San Bernardino County Superior Court, Case No. CIVDS1902923 ("*Wong*"). (Doc. 47-1 at 8)

The parties report that "[d]ue to the number of overlapping claims in *Grob*, *Wong* and *Garcia*, counsel in those cases agreed that counsel in *Salgado* could attempt to negotiate a global settlement in all four actions." (Doc. 47-1 at 8) On November 7, 2019, Plaintiffs filed "a First Amended Complaint based on or related to the operative pleaded facts in [*Salgado*] and *Grob*, *Wong* and *Garcia* Related Actions." (*Id.*; *see also* Doc. 50)  Specifically, Plaintiffs allege at T-Mobile: (1) failed to pay overtime wages at the legal overtime pay rate, (2) failed to pay all wages, (3) failed to provide meal periods, (4) failed to authorize and permit all paid rest periods, (5) failed to pay premium wages at the legal pay rate, (6) failed to fully reimburse work expenses, (5) failed to pay paid time off, (8) failed to maintain required record, (9) failed to timely furnish accurate itemized wage statements, and (10) engaged in unfair business practices. (*See generally* Doc. 50)

On August 22, 2019, the parties participated in a mediation with Jeff Krivis. (Doc. 47-1 at 9) Though the parties did not reach a settlement on the day of the mediation, they engaged in further

negotiations and "entered into an agreement that settled the Action and all of the Related Actions." (*Id.*) Thus, Plaintiffs report the claims in *Grob*, *Wong* and *Garcia* "have been accounted for and valued in [the proposed] settlement." (*Id.* at 8) Accordingly, Plaintiffs sought conditional certification of the settlement class and preliminary approval of the settlement terms.

The Court granted preliminary approval of the settlement on November 26, 2019. (Doc. 55) The Court appointed Plaintiffs Emmanuel Salgado, Gael Grob, David Garcia, and Andre Wong as the Class Representatives. (*Id.* at 21) The Court authorized Plaintiffs' request for class representative enhancement payments "in the amount up to the amount of $15,000 for Emanuel Salgado; $5,000 for Gael Grob, $5,000 for David Garcia, and $5,000 for Andre Wong." (*Id.* at 22) In addition, the Court appointed the following as Class Counsel: Kevin Barnes and Gregg Lander of the Law Offices of Kevin J. Barnes; Raphael Katri of the Law Offices of Raphael A. Katri; Matthew Matern of Matern Law Group, PC; Nazo Koulloukian of Koul Law Firm; Sahag Majarian, II of the Law Offices of Sahag Majarian II; and Dennis Moss and Ari Moss of Moss Bollinger LLP. (*Id.* at 21) Class Counsel were authorized to and authorized Class Counsel to seek fees that did "not to exceed 30% of the gross settlement amount and expenses up to $70,000." (*Id.* at 22) Finally, the Court appointed Rust Consulting, Inc., as the Settlement Administrator. (*Id.* at 21-22)

On December 6, 2019, the Court approved the Class Notice that conveyed this information to class members. (Doc. 58 at 5-10, Doc. 59) In addition, the Class Notice informed class members of the class definition approved by the Court, claims and issues to be resolved, representation by counsel, how a class member may choose to be excluded from the class, the time and method to opt-out of class membership, and the binding effect of a class judgment. (*See* Doc. 59)

On December 31, 2019, the Settlement Administrator mailed the Class Notice to 7,820 Class Members. (Doc. 71 at 7, Fringer Decl. ¶ 10) However, in February 2020, the parties "learned that the data collection efforts identifying the prospective class members and the proper number of work weeks associated with each class member was flawed." (Doc. 66 at 1) The parties notified the Court of the issue, and "agreed that the defendant will retain a third-party IT consultant who will assist in creating the algorithm needed to correctly gather the data and to verify the accuracy of the data collected." (*Id.*) On March 11, 2020, the Settlement Administrator "received a revised mailing list containing Class

Member's names and corrected employment information." (Doc. 71 at 7, Fringer Decl., ¶ 11) The Settlement Administrator reviewed the data "and identified 78 individuals who were no longer Class Members." (*Id.*) A revised Class Notice was mailed via First Class Mail to 8,815 Class Members on April 10, 2020. (*Id.*, ¶ 13) Class Members were informed of their right to "submit an exclusion, objection and/or dispute postmarked by May 25, 2020." (*Id.*)

Of the Class Notices, 444 were "returned as undeliverable for the first time" to the Settlement Administrator. (Doc. 71 at 8, Fringer Decl. ¶ 15) The Settlement Administrator performed skip traces on the addresses, and identified 385 more current addresses, to which the revised notices were mailed. (*Id.*) However, "49 Revised Class Notices were returned to Rust [Consulting] as undeliverable a second time." (*Id.*) Thus, the Settlement Administrator reports that "205 Revised Class Notices remain undeliverable." (*Id.*) The Settlement Administrator did not receive any objections to the settlement, but received two written requests for exclusion, which resulted in 8,813 participating class members. (*Id.*, ¶¶ 18-20)

Plaintiff filed the motion now pending before the Court for final approval of the Settlement on January 15, 2020. (Doc. 62) Following the data errors, Class Counsel filed additional briefing on June 8, 2020. (Doc. 72) Defendant does not oppose the request for approval of the settlement, request for fees and costs, or the class representative enhancements.

## **SETTLEMENT TERMS**[1]

The parties "agreed on a settlement of $8,000,000 on a class wide, common fund basis with no claim form requirement and with no residual to revert to the Defendant." (Doc. 62-1 at 11; *see also* Doc. 48-1 at 9, Settlement ¶ 33) Defendant agrees to fund the Settlement for a class defined as follows:

> [A]ll persons employed by Defendant in California as hourly-paid, non-exempt employees who worked in retail locations, including but not limited to, Retail Sales Managers, Retail Assistant Managers, Retails Sales Associates, and Mobile Experts, or functionally equivalent positions at any time during the Class Period.

(Doc. 48-1 at 3, Settlement ¶ 6) In addition, the Class Period is defined as "the period from February 3,

---

[1] At the time Plaintiffs filed their motion for preliminary approval of the class settlement, they did not submit a fully executed agreement. (*See* Doc. 47-3 at 25-28) On October 30, 2019, Kevin Barnes filed a supplemental declaration to the motion and attached a fully executed "Joint Stipulation of Class Action Settlement and Release," including the signatures of all Plaintiff's counsel and class representatives. (Doc. 48-1) Accordingly, the Court's citations herein are to the fully executed agreement.

2013, through the date of Preliminary Approval, or November 30, 2019, or the last day of the pay period in which the total number of workweeks of 1,045,295.92 increases by more than 10% (the 'Workweek Threshold Cutoff Date'), whichever occurs first."  (*Id.*, Settlement ¶ 7)

## I.     Payment Terms

The settlement fund will cover payments to class members and payments to Plaintiffs for their roles as class representatives.  (Doc. 48-1 at 9, Settlement ¶ 33) In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id*. at 9-11, ¶¶ 33-38) Specifically, the settlement provides for the following payments from the gross settlement amount:

- Plaintiff Emmanuel Salgado will receive $15,000;

- Plaintiffs David Garcia, Gael Grob, and Andre Wong will receive $5,000 each;

- Class counsel will receive fees not to exceed $2,640,000) and litigation expenses not to exceed $70,000;

- The California Labor and Workforce Development Agency shall receive $225,000 from the award pursuant to PAGA;

- The Settlement Administrator will receive reasonable costs of administration, which are estimated to be $56,000.

(Doc. 48-1 at 3-10, Settlement ¶¶ 2, 8, 13-14, 29, 34-37)

After the identified deductions and payments, the remaining funds— the "Net Settlement Amount" — will be distributed to all participating class members.  (Doc. 48-1 at 6, Settlement ¶ 15) Shares of the individual settlement payment for each class member will be determined "based upon the number of Workweeks a Class Member worked during the Class Period."  (*Id.* at 11, Settlement ¶ 39) Specifically, the payments will be calculated as follows:

39(a)     The Claims Administrator will calculate the total number of Workweeks worked by each Class Member during the Class Period and the aggregate total number of Workweeks worked by all Class Members during the Class Period. Each terminated Class member, the total Workweeks will include six additional workweek credits to compensate for the claim for Waiting Time Penalties.

39(b)     To determine each Class Member's estimated share of the Net Settlement Amount, the Settlement Administrator will use the following formula: The Net Settlement Amount will be divided by the aggregate total number of Workweeks, resulting in the "Workweek Value."

39(c)     Each Class Member's share of the Net Settlement Amount will be calculated

by multiplying each individual Class Member's total number of Workweeks by the Workweek Value. The Individual Settlement Payment will be reduced by any required deductions for each Class Members as specifically set forth herein, including employee-side tax withholdings or deductions.

39(d)     The entire Net Settlement Amount will be disbursed to all Class Members who do not submit timely and valid Requests for Exclusion. If there are any valid and timely Requests for Exclusion, the Settlement Administrator shall proportionately increase each Participating Class Member's share of the Net Settlement Amount according to the number of Workweeks worked, so that the amount actually distributed to the Settlement Class equals 100% of the Net Settlement Amount.

(Doc. 48-1 at 11-12, Settlement ¶ 39) Using this method, the Settlement Administrator reports that the average settlement payment will be approximately $595.29, and the highest settlement payment will be approximately $1,629.03.  (Doc. 71 at 8, Fringer Decl. ¶ 20)

## II.     Releases

The Settlement provides that Plaintiff and Class Members, other than those who elect not to participate in the Settlement, shall release Defendant from the claims arising "from February 13, 2013 through the date of Preliminary through the date of Preliminary Approval, the Workweek Threshold Cutoff Date, or November 30, 2019, whichever comes first."  (Doc. 48-1 at 7, ¶ 26) Pursuant to the Settlement, "Released Claims" include:

[A]ll claims, rights, demands, liabilities, and causes of action, arising from, or related to, the claims alleged or which could have been alleged in the proposed First Amended Complaint based on or related to the operative pleaded facts in the Action and Related Actions, including: (i) all claims for unpaid minimum and overtime wages, however asserted or accrued, including but not limited to failing to properly calculate the regular rate for overtime and failing to pay for off-the-clock work (such as the use of GroupMe or other cell phone applications while off-the-clock); (ii) all claims for failure to pay commissions correctly or failure to provide executed commissions agreements; (iii) all claims for failing to provide meal and rest breaks; (iv) all claims for failing to pay meal or rest break premiums or properly calculate the rate for meal and rest break premium pay; (v) all claims for the failing to timely pay wages upon termination; (vi) all claims for the failing to fully reimburse business expenses, including mileage and use of personal cellular phones; (vii) all claims for wage statement violations; (viii) all claims for failing to maintain accurate records; (ix) all claims for failing to accrue and pay "paid time off" and (x) all claims asserted through California Business & Professions Code §§ 17200, et seq. related only to the above Released Claims or as asserted in the applicable PAGA Notices to the LWDA, and California Labor Code§§ 2698, et seq. related only to the above Released Claims or as asserted in the applicable PAGA Notices to the LWDA.

(Doc. 48-1 at 7, Settlement ¶ 24)

In addition, the Settlement provides that Plaintiffs and Participating Class Members waive and relinquish, unknown claims including "any and all actions, suits, claims, demands, rights, liabilities,

and causes of action which specifically relate to the Released Claims that Plaintiffs do not know of or suspect to exist in their favor, which, if known by any of them, might have affected their agreement to the Settlement." (Doc. 481-1 at 8-9, Settlement ¶ 39) Specifically, the Settlement provides:

> With respect to Unknown Claims, as of Final Approval, Plaintiffs and Participating Class Members hereby expressly waive and relinquish, to the fullest extent permitted by law, insofar as the claims arise from, or are related to, the Released Claims, the benefits of section 1542 of the California Civil Code (as well as any and all provisions, rights, and benefits of any similar state or federal law), which states:
>
> > A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her would have materially affected his or her settlement with the debtor or released party.
>
> Thus, if the facts relating to this Settlement are found hereafter to be different from the facts now believed to be true, the Release set forth in this Agreement will remain fully effective. The provisions of this paragraph also apply to the PAGA claims that are released by Class Members who opt-out of the non-PAGA portions of the settlement

(Doc. 48-1 at 8-9, ¶ 31) Thus, the releases by Plaintiffs and the Participating Class Members appear to be the same.

### III.  Objections and Opt-Out Procedure

Any class member who wished may file objections or elect not to participate in the non-PAGA portion of the Settlement. (*See* Doc. 48-1 at 14-15, Settlement ¶¶ 50-51) The Notice of Class Action Settlement ("the Notice") explained the claims that are released as part of the Settlement. (Doc. 58 at 5-10, Doc. 59) In addition, the Notice outlined the procedures for class members to opt out from the class, including the time and methods accepted. (*Id.*) Class members were also informed they had the right to "submit an exclusion, objection and/or dispute postmarked by May 25, 2020." (*See* Doc. 71 at 7, Fringer Decl. ¶ 13)

### IV.  Service of the Class Notice Packets and Responses Received

Amy Fringer, Senior Project Manager for Rust Consulting, reports the notice was mailed via the United States Postal Service on April 10, 2020. (Doc. 71 at 6-7, Fringer Decl. ¶¶ 1, 12-13) Ms. Fringer reports the Settlement Administrator received two written requests for exclusion, leaving 8,813 participating class members. (*Id.* at 8, ¶ 19) She also reports the Settlement Administrator did not receive any objections to the Settlement. (*Id.* at 8, ¶ 18) Likewise, the Court did not receive any objections to the Settlement.

1

**APPROVAL OF A CLASS SETTLEMENT**

2      When parties settle an action prior to class certification, the Court has an obligation to "peruse

3  the proposed compromise to ratify both the propriety of the certification and the fairness of the

4  settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is

5  generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

6  *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the

7  proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

8  *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

9  the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

10  **I.      Class Certification[2]**

11      Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

12  provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

13  of all."  Fed. R. Civ. P. 23(a).  Under the terms of the Settlement, the proposed Settlement Class is

14  comprised of "all persons employed by Defendant in California as hourly-paid, non-exempt employees

15  who worked in retail locations, including but not limited to, Retail Sales Managers, Retail Associate

16  Managers, Retails Sales Associates, and Mobile Experts, or functionally equivalent positions at any

17  time during the Class Period."  (Doc. 48-1 at 4, ¶ 6)

18      Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

19  are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule."  *Wal-Mart Stores,*

20  *Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308

21  (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the

22  class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Narouz v.*

23  *Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

24      **A.      Rule 23(a) Requirements**

25      The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

26  by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

27

28          [2] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification
of the Settlement Class is required.

155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

### 1.    Numerosity

A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific numerical threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) ("find[ing] the numerosity requirement . . . satisfied solely on the basis of the number of ascertained class members . . . and listing thirteen cases in which courts certified classes with fewer than 100 members").  Here, the Settlement Administrator has identified 8,813 participating class members. (Doc. 71 at 8, Fringer Decl. ¶ 20) Therefore, the numerosity requirement is satisfied.

### 2.    Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). Commonality "does not mean merely that [class members] have all suffered a violation of the same pro-vision of law," but "claims must depend upon a common contention."  *Wal-Mart Stores*, 564 U.S. at 350.  Previously, Plaintiffs asserted there are common questions of law and facts in this case, because the class members were subjected to the same policies as employees of Defendant. (Doc. 47-1 at 21-22) According to Plaintiffs, common questions include:

- Whether Defendants properly included all commissions, bonuses and prizes into the overtime rate as required by California law;

- Whether Defendants required Class Members to work off the clock, including sending and responding to texts on the GroupMe app, without paying for all hours worked;

- Whether Defendants had a rest period policy that required Class Members to remain on the premises during their rest break in violation of California law and

did not ever pay an additional one hour of wages for the rest period violations;

- Whether Defendants had a meal and rest period practice that did not allow for meal or rest breaks and did not ever pay an additional one hour of wages for any violations;

- Whether Defendants failed to reimburse Class Members for all mileage expenses for the use of their personal vehicles and cell phones as required by California law;

- Whether Defendants failed to accrue and pay "paid time off" as required by California law;

- Whether Defendants failed to timely pay final wages due to former Class Members and/or pay waiting time penalties pursuant to Labor Code §203;

- Whether Defendants failed to provide proper wage statements to Class Members pursuant to Labor Code §226(a);

- Whether Defendants subjected Class Members to Defendant's unlawful, unfair and/or fraudulent business acts or practices in the form of the violations described above; and

- Whether Plaintiffs and the Class Members are entitled to injunctive/declaratory relief.

(Doc. 62-1 at 14-15) Furthermore, Defendant "agrees that there are sufficient common questions to support creation of a Settlement class." (Doc. 47-2 at 5) Thus, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.    Typicality

This requirement requires a finding that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The standards under this rule are permissive, and a claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Plaintiffs alleged they were each employed by Defendants during the relevant period.  (Doc. 50

11

at 4-5, ¶¶ 6-10) Emmanuel Salgado was employed "as an hourly-paid Retail Sales Associate and hourly-paid Retail Associate Manager from approximately November 2010 to August 10, 2016 in Bakersfield, California." (*Id.* at 4-5, ¶ 6) Gael Grob worked for Defendant "as an hourly-paid Mobile Expert (formerly known as Retail Sales Associate) from approximately May 2015 to April 2019 in Santa Clarita, California." (*Id.*, ¶ 7) David Garcia was employed "as an hourly paid Retail Sales Associate from approximately February 2008 to November 2015 in Covina, California." (*Id.*, ¶ 8) Finally, Andre Wong was also employed "as an hourly-paid Mobile Expert (formerly known as Retail Sales Associate) from approximately September 2010 to September 2018 in Montclair, California." (*Id.*, ¶ 10) According to Plaintiffs, their claims are typical of the class because they "worked under the same policies and procedures and were paid according to the same pay plan for the entire period, as all other putative Class Members/PAGA aggrieved employee." (Doc. 47-1 at 22-23) Because it is undisputed that Plaintiffs were subjected to the same polices and application procedure as the Settlement Class Members, the typicality requirement is satisfied.

### 4.    Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). Accordingly, this requirement is satisfied if the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

#### a.    Class representative

Previously, Plaintiffs each sought appointment as a class representative, asserting that they "have no claims that are antagonistic to the Class." (Doc. 47-1 at 23) Also, the parties do not identify any conflicts between Plaintiffs and the putative class members. Thus, the Court finds Plaintiffs will fairly and adequately represent the interests of the class.

#### b.    Class counsel

Pursuant to the Settlement terms, Kevin Barnes and Gregg Lander of the Law Offices of Kevin

J. Barnes; Raphael Katri of the Law Offices of Raphael A. Katri; Matthew Matern of Matern Law Group, PC; Nazo Koulloukian of Koul Law Firm; Sahag Majarian, II of the Law Offices of Sahag Majarian II; and Dennis Moss and Ari Moss of Moss Bollinger LLP seek appointment as class counsel. (Doc. 48-1 at 3, ¶ 3) In addition, Kevin Barnes and Gregg Lander seek appointment as "Lead Class Counsel" in the action.  (*Id.*, ¶ 4)

Plaintiffs report that Class Counsel are "very experience and qualified."  (Doc. 47-1 at 23)  Mr. Barnes asserts, "The Plaintiffs' firms advanced as Class Counsel have substantial experience in wage and hour Class action cases and have been approved as Class Counsel in numerous other wage and hour Class actions."  (Doc. 47-2 at 5-6, Barnes Decl. ¶ 6)  In addition, Mr. Barnes observes that "Plaintiffs' attorneys … have aggressively litigated this matter for almost three years, have engaged in formal discovery including propounding and responding to written interrogatories, the production of documents, several depositions, briefing of the class certification motion and attending a formal all-day mediation."  (*Id.* at 6, ¶ 6)

Raphael Katri reports that he is admitted to practice law in the states of California, Texas, and New York, and his "current law practice is devoted almost exclusively to employment law."  (Doc. 47-6 at 3, ¶¶ 2-3) Mr. Katri asserts he has "actively participated in the prosecution and successful settlement of multiple wage and hour class action lawsuits and representative actions, helping to recover millions of dollars on behalf of the respective class members in those cases."  (*Id.*, ¶ 4) He reports that by partnering with the Law Officers of Kevin T. Barnes, "both of [the] firms have and will continue to aggressively and competently represent the named plaintiff and the other aggrieved individuals in this case." (*Id.* at 4, ¶ 5)

Dennis Moss notes that he has been practicing employment and labor law since 1977, during which time he "handled numerous cases in all aspects of employment and labor law, including but not limited to numerous federal and state wage and hour class action cases, National Labor Relations Board proceedings, wrongful discharge litigation, discrimination cases, administrative appeals involving wage and hour and other employment issues, numerous arbitrations, and various other matters involving both traditional labor-law (union/ management law) and employment law issues in the non-union context." (Doc. 47-7 at 3, Moss Decl. ¶ 3) Mr. Moss stated his "litigation experience has included over twenty-

five arguments in various courts of appeal, including the 9th Circuit, Federal Circuit, and the First, Second, Third, Fourth and Sixth Appellate Districts of the California Courts of Appeal." (*Id.*) In addition, Mr. Moss reports he been appointed as "lead counsel in dozens of class actions and collective actions over the last several years," in both federal and state court. (*Id.* at 3-4, ¶ 3)

Nazo Koulloukian reports he was admitted to the State Bar of California in June 2009 and is "a current member of the California Employment Lawyers Association (CELA)." (Doc. 47-8 at 3, Koulloukian Decl. ¶ 3) He also notes that he was "named as one of the Rising Stars for the Super Lawyers of Southern California during 2016, 2017, and 2018." (*Id.*) According to Mr. Koulloukian, his law firm "co-counsels with various other attorneys, all of whom are actively and continuously practicing in employment litigation, representing almost entirely employee plaintiffs, in both individual and class actions, in … Superior Courts throughout the State, in the Court of Appeal, and in various Federal courts." (*Id.* at 4, ¶ 4) Mr. Koulloukian reports that "more than half of [his] active caseload includes wage and hour class action cases." (*Id.*) Further, he asserts he co-counseled with Sahag Majarian, II (*id.*), who also seeks appointment as class counsel in this action.

Mr. Majarian reports he has been "in private practice primarily representing consumers against insurance companies and workers against their employers" since 1990." (Doc. 48-3 at 4, Majarian Decl. ¶ 3) He indicates that he "devoted a significant portion of my practice to employment law and class actions, and [has] been appointed co-class counsel for the plaintiffs in no less than 50 wage and hour class actions." (*Id.*) Further, Mr. Majarian has "participated in over 150 class action mediations," which involved "extensive preparation, development of thorough knowledge of the legal issues related to certification and liability, and full immersion and participation in the mediation and negotiation process." (*Id.* at 5, ¶ 4)

Finally, Matthew Matern reports he is "the principal of Matern Law Group, PC," which is "is a 23- attorney law firm that is actively and continuously practicing in employment litigation, almost exclusively representing employees in both individual and class actions in both state and federal courts throughout California." (Doc. 48-4 at 4, Matern Decl. ¶ 2) He asserts his law firm "is qualified to handle this litigation because the firm is experienced in litigating Labor Code violations in both individual and class action cases." (*Id.*, ¶ 3) Mr. Matern reports he has "been involved in over 100

class action settlements, with many of them settling in the seven figure range." (*Id.* at 5, ¶ 6) In addition, he notes that he "represented clients in numerous wage and hour class action lawsuits that settled with per-class-member recoveries in a range similar to the anticipated per-class member recovery in the instant case." (*Id.*) According to Mr. Matern, this "work has led [him] to be recognized as a Southern California Super Lawyer every year since 2009." (*Id.*, ¶ 9)

Defendants did not oppose the requested appointments or assert Plaintiffs' counsel are inadequate to represent the interest of the class. Based upon the information provided regarding the experience of counsel, the Court finds Class Counsel satisfy the adequacy requirement.

### B.      Certification of a Class under Rule 23(b)(3)

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266. Here, Plaintiffs assert that certification of the Class is appropriate under Rule 23(b)(3) which requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." (*See* Doc. 62-1 at 14-15)

#### 1.      Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

Plaintiffs contend the predominance requirement is satisfied because "the main issues involve the legality of Defendant's compensation plans, meal and rest period policies, payment of meal and rest period premiums, expense reimbursement plan, and the validity of its wages statements." (Doc. 47-1 at 21-22)  In addition, Plaintiffs assert the common questions identified above are supported by evidence, including: "Defendants' policies, payroll records, time records and pay stubs given to all non-exempt employees."  (Doc. 62-1 at 15)

15

1          2.      Superiority

2          The superiority inquiry requires a determination of "whether objectives of the particular class

3   action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

4   This tests whether "class litigation of common issues will reduce litigation costs and promote greater

5   efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

6   23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

7   method of adjudication, including (1) the class members' interest in individual litigation, (2) other

8   pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4) difficulties

9   with the management of the class action.

10                 a.      *Class members' interest in individual litigation and other cases*

11         This factor is relevant when class members have suffered sizeable damages or have an

12  emotional stake in the litigation. *See In re N. Dist. of Cal., Dalkon Shield*, 693 F.2d 847, 856 (9th Cir.

13  1982).  In this case, only two class members requested exclusion from the Settlement. There has been

14  no other indication that the remaining 8,813 class members had a desire to pursue individual litigation

15  apart from this action.  Further, the parties have not identified any other litigation that remains pending

16  related to Plaintiffs' claims, after the parties agreed to a global settlement that involved the claims

17  presented in *Grob*, *Wong* and *Garcia*.  Therefore, these factors weigh in favor of class certification.

18                 b.      *Desirability of concentrating litigation in one forum*

19         Because common issues predominate on Plaintiffs' class claims, "presentation of the evidence

20  in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial

21  economy."  *Galvan v. KDI Distrib.*, 2011 WL 5116585, at *12 (C.D. Cal. Oct. 25, 2011). Indeed, the

22  benefits of a consolidated action are apparent here, where the parties reached a settlement that

23  included claims that initially were brought in the Los Angeles Superior Court, the Central District of

24  California, and the San Bernardino County Superior Court.  (*See* Doc. 47-1 at 8)

25                 c.      *Difficulties in managing a class action*

26         The Supreme Court explained that, in general, this factor "encompasses the whole range of

27  practical problems that may render the class format inappropriate for a particular suit."  *Eisen v.*

28  *Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Because the parties have reached a settlement

agreement, it does not appear there are any problems with managing the action.  Therefore, this factor weighs in favor of class certification.

### 3.    Conclusion

Plaintiffs carry their burden to demonstrate the predominance and superiority requirements of are satisfied, and that the Settlement Class is maintainable under Rule 23(b)(3).  Accordingly, Plaintiffs' motion for certification of the Settlement Class is **GRANTED.**

## II.    Approval of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Approval is required to ensure settlement is consistent with Plaintiffs' fiduciary obligations to the class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The Ninth Circuit identified several factors for the Court to evaluate whether a settlement agreement meets these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the product of collusion among the negotiating parties."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  Reviewing the settlement terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotation marks and citation omitted).

### A.    Strength of Plaintiffs' case

When measuring the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."  *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp 1379, 1388 (D. Az. 1989)).

In this action, Plaintiffs raised thirteen causes of action that the factfinder would be required to

evaluate on the merits.  (*See generally* Doc. 50) The Settlement was reached after the parties "engaged in formal discovery including propounding and responding to written interrogatories, the production of documents, several depositions, briefing of the class certification motion and attending a formal all-day mediation." (Doc. 62-1 at 20) This allowed the parties to assess the strengths and weaknesses of the claims presented.  (*Id.*)  Accordingly, this factor weights in favor of approval of the Settlement.

**B.     Risks, expenses, complexity, and further litigation**

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the proposed settlement is not approved, the parties would have to engage in further litigation, including the related actions of *Grob*, *Wong* and *Garcia.*  Plaintiffs assert that in agreeing to settle,

> Plaintiffs took into account the risks that the Class would be certified, risks related to proof of their claims, and the strengths and weaknesses of Defendant's other defenses. Plaintiffs also took into account the possibility that if a settlement were reached after additional years of litigation, the great expenses and attorneys' fees of litigation would reduce the amount of funds available to Class Members for settlement. Furthermore, Plaintiffs also took into consideration the time delay and financial repercussions of liability trials, numerous damages trials, and the possibility of an appeal by Defendant.

(Doc. 47-1 at 18-19) The time and expense of continued litigation could outweigh any additional recovery.  As Plaintiffs observes, if this action had settled following additional litigation, fewer funds may be available to class members in the various actions.  (*See id.*)  On the other hand, the Settlement provides for immediate recovery.  Due to the risk of the claims of class members, this factor weighs in favor of final approval.

**C.     Maintenance of class status through trial**

Notably, this Court had not certified a class at the time the parties reached an agreement of the claims presented.  Plaintiff Salgado filed a motion for class certification on January 14, 2019 (Doc. 29), which T-Mobile USA opposed on March 29, 2019.  (Doc. 35) However, the parties requested a continuance of the hearing on the motion, to a date after the scheduled mediation.  (Doc. 43) Thus, though Defendants have not opposed class certification for settlement purposes, it is clear that class certification was otherwise contested.  Further, Plaintiffs acknowledge that "[a]bsent settlement, there was a risk that this case would not be certified, would be decertified at the time of trial and or on appeal." (Doc. 62-1 at 18) Due to the risk of maintenance of a class in the action—particularly a class

encompassing claims from all cases consolidated here— the Court finds this factor weighs in favor of approval of the Settlement.

### D.     Amount offered in settlement

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole," and the amount is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."  *Id.*, 688 F.2d at 625, 628.

The proposed gross settlement amount totals $8,000,000.  (Doc. 48-1 at 5, Settlement ¶13)  Moreover, "Defendants changed one of their policies and procedures at issue in this lawsuit by no longer requiring on premise rest breaks," which Plaintiffs assert "adds substantial value to this settlement."  (Doc. 62-1 at 28)   Given the time expended by parties in mediation and the continued negotiations prior to reaching this agreement, it appears the parties agree the monetary amount and policy change reflect a fair compromise as to all of Plaintiffs' allegations.  Indeed, in executed agreement, the parties indicate: "The parties believe this Settlement Agreement is a fair, adequate and reasonable settlement of the Action and Related Actions."  (*Id.* at 20, ¶ 72) Accordingly, the Court finds the amount offered supports final approval of the Settlement.

### E.     Extent of discovery completed and stage of the proceedings

Plaintiffs report that the parties "engaged in formal discovery including propounding and responding to written interrogatories, the production of documents, several depositions, briefing of the class certification motion and attending a formal all day mediation."  (Doc. 62-1 at 20) Plaintiffs report, "Defendants provided extensive documentation and data related to the claims asserted in this case as well as a number of work weeks, class size and other necessary information for Plaintiffs to create a damages exposure analysis." (*Id.*)  In addition, "Plaintiffs hired an expert economist to prepare for both the class certification motion as well as damage calculations and an exposure analysis for the mediation."  (*Id.*)  Consequently, this factor supports approval of the Settlement.

///

### F.      Views of counsel

In general, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528. Here, Class Counsel assert, "[t]his is fair, adequate and reasonable and in the best interests of the Class." (Doc. 62-1 at 21; *see also* Doc. 62-2 at 8, Barnes Decl. ¶13) Similarly, Defendant indicated in the Settlement that it "is fair, adequate, and reasonable…" (Doc. 48-1 at 10, Settlement ¶ 71) Thus, the views of the parties' counsel support approval of the Settlement.

### G.      Reaction of Class Members to the Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529.

Plaintiffs agreed to the terms and executed the Settlement Agreement. (Doc. 48-1 at 25-28) No class members objected to the Settlement, and only two people out of 8,815 individuals requested exclusion from the Class. (Doc. 71 at 2) Given the significant majority of Class Members who reacted favorably to the class by not requesting exclusion or filing objections, this factor weighs in favor of the Settlement.

### H.      Collusion between negotiating parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960. As the noted above, the parties first utilized an impartial mediator, and continued negotiations after the mediation with Jeff Krivis. (*See* Doc. 62-1 at 111; Doc. 47-1 at 9, 13) Thus, it appears the agreement is the product of non-collusive conduct, and this factor weighs in favor of approval of the Settlement.

## IV.    Conclusion

The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement, which is fair, reasonable, and adequate as required by Rule 23. Therefore, the request for final approval of the Settlement Agreement is **GRANTED**.

///

## REQUEST FOR ATTORNEYS' FEES AND COSTS

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  Pursuant to the Settlement, Class counsel may request attorneys' fees "of not more than Two Million Six Hundred Forty Thousand Dollars ($2,640,000), which represents a third of the gross settlement. (Doc. 48-1, Settlement ¶34) Class Counsel seeks fees totaling $2,400,000.00 and $40,005.68 in litigation costs and expenses.  (Doc. 62-1 at 12; Doc. 71 at 2)

Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded their fees and costs from the fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.  The Settlement applies a distribution formula to determine the amount paid to each class member (*see* Doc. 48-1 at 11-12, Settlement ¶ 39), and application of the common fund doctrine is appropriate.

## I.    Legal Standards

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement" to determine whether it is "'fundamentally fair, adequate, and reasonable' Fed.R.Civ.P. 23(e)."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  To do so, the Court must "carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."  *Id*.

A court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *See Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743

F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The party seeking fees bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Court may use either a lodestar or percentage calculation to evaluate a fee request. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (holding both a lodestar and percentage calculations "have [a] place in determining what would be reasonable compensation").  Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances." *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (court must find the awarded fees are "fundamentally fair, adequate, and reasonable").

///

### A.       Lodestar method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 978 (9th Cir. 2008). Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). However, the Court has since suggested that the fixed or contingent nature of a fee and the "desirability" of a case are no longer relevant factors. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

### B.       Percentage from the common fund

As the name suggests, under this method, "the court makes a fee award on the basis of some percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3. In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total settlement value, with 25% considered the benchmark. *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *see also In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure"). The percentage awarded in fees may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear. *Graulty*, 886 F.2d at 272.

When evaluating whether the requested percentage is reasonable, courts may consider a number

of factors, including: (1) the results obtained for the class; (2) the risk undertaken by class counsel, including the complexity of the issues; (3) the length of the professional relationship between class counsel and the plaintiffs; and (5) the market rate, through a lodestar cross-check. *Vizcaino,* 290 F.3d at 1048-1050; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

## II.    Evaluation of the Fees Requested

Class Counsel request the Court determine the reasonableness of the fee award by using the percentage of the common fund rather than the lodestar method, and award 30% of the common fund. (*See* Doc. 62-1 at 22) "The district court has discretion to use the lodestar method or the percentage of the fund method in common fund cases."  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 109 F.3d 602, 607 (9th Cir. 1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  Furthermore, the Court may "appl[y] the lodestar method as a crosscheck" to determine whether the percentage requested is reasonable.  *Vizcaino*, 290 F.3d at 1050, n.5.

### A.    Results obtained for the class

Plaintiffs contend "the degree of success achieved in this case justifies the requested [fees]." (Doc. 62-1 at 31) Courts have recognized that the result achieved for the class is a major factor to be considered in making a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  The Ninth Circuit observed that "[e]xceptional results are a relevant circumstance" to an adjustment from the benchmark award. *Vizcaino*, 290 F.3d at 1048.

Plaintiffs report they "estimated that the Defendants' realistic exposure in this case was approximately $14,948,523." (Doc. 62-1 at 18, citing Doc. 47-2, Barnes Decl., ¶¶ 6-11) Thus, Plaintiffs report the settlement "is 53.5% of the total realistic exposure value and provides a definite and significant recovery in light of the risks of further litigation."  (*Id.* at 18-19) On the other hand, it does not appear that fees were included in the estimated exposure, and Class Counsel requests $2,400,000 from the $8,000.000 fund.  If the requested fees are deducted, this results in a recovery for the class that is approximately 37% of the estimated liability—prior to deductions for costs, Settlement Administration, or the PAGA payment. After the anticipated deductions, "the average settlement is

1    estimated to be approximately $595.29" and "the maximum settlement payment is estimated to be

2    approximately $1,629.03."  (Doc. 71 at 8, Fringer Decl. ¶ 20)

3          As a whole, these are fair and acceptable result. However, the anticipated payments for class

4    members are not "exceptional."  *See, e.g., Adoma v. University of Phoenix, Inc.*, 913 F.Supp.2d 964,

5    983 (E.D. Cal. 2012) (finding the recovery of $2,000 per class member in wage and hour class action

6    was "positive" but "not so exceptional as to … justify an increase in the 25% benchmark"); *Taylor v.*

7    *TIC - The Industrial Company*, 2018 WL 6131198 at *7 (C.D. Cal. 2018) (declining to depart from the

8    benchmark where the results achieved were not "extraordinary"); *see also McKenzie v. Federal Express*

9    *Corp.,* 2012 WL 2930201 at *8 (C.D. Cal. Jul. 2, 2012) (declining to award fees above the benchmark

10   for a "favorable" recovery that included an $8.25 million class fund and injunctive relief, because the

11   recovery could "hardly be described as 'exceptional' within the meaning of applicable jurisprudence").

12   Accordingly, this factor does not support the requested upward departure from the benchmark.

13         **B.     Risk undertaken by counsel**

14         The risk of costly litigation and trial is an important factor in determining the fee award.

15   *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court

16   explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual

17   merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*,

18   505 U.S. 557, 562 (1992). As a result, the Ninth Circuit approved a fee award slightly above the

19   benchmark in *Vizcaino* where the case was "extremely risky for class counsel" and the "plaintiffs lost

20   in the district court — once on the merits, once on the class definition — and twice counsel succeeded

21   in reviving their case on appeal." *Id.*, 290 F.3d at 1048.

22         Class Counsel asserts the requested award above the benchmark is appropriate because "the

23   law[s] on the claims in this case are ever changing in the state and federal appellate courts and the

24   California Supreme Court."  (Doc. 62-1 at 30-31) Class Counsel observes:

25             Every year key appellate decisions are issued on wage and hour claims alleged in this
             case that impact rounding, meal and rest claims as well as the derivative claims plead
26             here. The legal uncertainty and exposure on wage and hour class action cases make
             these cases very litigious, difficult to litigate and very expensive, time consuming and
27             risky contingent fee cases.

28   (Doc. 62-1 at 31)

                                                     25

Notably, every case involves a risk by counsel, and Class Counsel broadly refers to the risks related to all wage and hour class actions. Class Counsel have not identified any risks undertaken that are *specific* to this action. (*See* Doc. 62-1 at 31) Class Counsel fail to show the case was factually complex or demonstrate extreme risks in pursuing the claims litigated.  For example, in *Vizcaino*, the plaintiffs "lost in the district court—once on the merits, once on the class definition" and the class counsel twice "succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1303.  The court found that the pursuit of the case was "extremely risky" given the absence of supporting precedents" and the challenges faced in the appeals.  *Id.*  As such, the risks supported an award of fees slightly above the benchmark.  *Id.* at 1048-49.  In contrast, Class Counsel did not face such challenges to the merits of Plaintiffs' claims.

In addition, the Ninth Circuit suggested that the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund).

Even though this case was taken on a contingency basis, Class Counsel do not identify any evidence that demonstrates they bore an atypical risk such that the Court should award fees above the benchmark.  *Compare with Vizcaino*, 290 F.3d at 1048.  Consequently, this factor does not weigh in favor of a fee award above the benchmark.

### C.      Complexity of issues and skills required

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award. *See Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *14-15 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law in an area where considerable deference is given to jail officials," and the action "encompassed two categories of class members"); *see also Hanlon*, 150 F.3d at 1029 (explaining that after calculating a lodestar, the fee award may be "adjusted upward or downward to account for several factors including … the complexity and novelty

of the issues presented"); *Couser v. Comenity Bank*, 125 F.Supp.3d 1034, 1049 (S.D. Cal. 2015) (considering "the complexity of the issues litigated" as a factor in the reduction of the fees to 15% of the common fund).

According to Class Counsel, "The legal issues raised in this case are very difficult due to the constantly changing law on rounding, meal breaks and rest break." (Doc. 62-1 at 25)  Class Counsel assert "[t]he complexity of this matter was further complicated by the fact that many Class Members are current employees of Defendants, who might have been reluctant to participate in Plaintiffs' investigation due to perceived fear of retribution by the employer."  (*Id.*)

On the other hand, Class Counsel have not identified any recent changes to wage and hour law that complicated the issues raised against Defendants or created novel issues in this action.  Class Counsel do not present any evidence that their investigation—or the prosecution of this matter—was hampered by reluctant putative class members.  Indeed, in seeking class certification prior to the Settlement, Plaintiffs submitted several declarations from putative class members, including a current employee. (*See* Doc. 29-2 at 4; Doc. 29-4 at 59, Covarrubias Decl. ¶ 2)  Because Class Counsel do not identify any evidence to support a finding that the factual and legal issues presented were complex or required significant skill, the Court is unable to find this factor supports an award of fees above the benchmark.

### D.    Length of professional relationships

Class Counsel do not address the length of their professional relationships with the plaintiffs in their motion for fees or assert that this factor warrants an upward departure from the benchmark.  (*See generally* Doc. 62-1)  Due to the lack of information in the brief, the Court has reviewed the declarations and billing records from counsel to determine the length of the professional relationships. It appears the professional relationship between Emmanuel Salgado and Raphael Katri began in August 2016, after which the Law Offices of Kevin T. Barnes became co-counsel.  (*See* Doc. 62-3 at 5; *see also* Doc. 71 at 35)  Sahag Majarian II reports that he "was approached by David Garcia in November of 2015 with potential employment law claims" and Andre Wong contacted him in February 2018 "relative to additional employment law claims he believed he had against Defendant."  (Doc. 62-5 at 5) Matthew Matern, counsel for Gael Grob, does not provide any information regarding when he began

his representation in his declaration or billing records.  (*See* Doc. 62-6) However, the initial complaint in *Grob T-Mobile USA, Inc.,* was filed on June 14, 2019, in the Central District of California, Case No. 2:19-cv-06352.  (Doc. 47-1 at 8)

Thus, the professional relationships between counsel and the named plaintiffs have each lasted for less than five years. The short duration of the professional relationships does not support an award above the benchmark and may warrant an award a downward departure.  *See Six Mexican Workers*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### E.      Lodestar crosscheck and market rate

Kevin Barnes reports Class Counsel's total hours worked will be at least 1,036.9 and the collective lodestar will be $771,897.50.  (Doc. 71 at 2, ¶ 5) (emphasis omitted) He reports this includes anticipated time for the final approval hearing, future contact with class members, and future contact with the claims administrator.  (*Id.*)  In support of the lodestar calculation, Class Counsel provided timesheets for each firm that worked on the action.

In general, when the lodestar is used as a crosscheck for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours."  *See Schiller*, 2012 WL 2117001 at *20 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir.2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D. Cal. 2007)).  However, because a cursory review of the provided timesheets indicated many entries for clerical tasks and internal communications between co-counsel, the Court has performed a more detailed review of the records.  Also, the lodestar calculation was flawed due to the hourly rates used by Class Counsel.

#### 1.      Hourly rates

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicant meets this burden by "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11; *see also Chaudhry v. City of*

*Los Angeles*, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate.")

Class Counsel applied hourly rates ranging from $595 to $950 for purposes of calculating their lodestar. (Doc. 62-1 at 27) According to counsel, these hourly rates are in accord with the prevailing rates, pointing to hourly rates identified in "[a] survey conducted by The National Law Journal," which identified hourly rates for firms located in Orange County, Los Angeles County, San Francisco County and San Diego County. (*Id.* at 28) Class Counsel refer to the declaration of Richard Pearl from a case in Los Angeles Superior Court, noting that Mr. Pearl "reviewed the comparable hourly rates of attorneys in California" and found courts approved hourly rates of $875 in Alameda County Superior Court and $750 in San Francisco County Superior Court. (Doc. 62-1 at 28-29; *see also* Doc. 62-2 at 58-73)

### a.    Relevant community and availability of local counsel

Importantly, the Supreme Court explained that attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984). In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho*, 523 F.3d at 979. Thus, when a case is in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate . . ." *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011). On the other hand, "rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

Plaintiffs present no evidence that local counsel was either unwilling or unable to prosecute their claims in this action. Consequently, there is no support for the proposition that the Court should apply the hourly rates from outside the local forum—such as those identified from the Central District and Northern District by the National Law Journal and Mr. Pearl. Thus, the Court must determine whether the hourly rates requested by counsel are reasonable for the Fresno Division of the Eastern

29

1   District.

2                          b.       Adjustment of hourly rates

3          Previously, this Court surveyed hourly rates and determined "courts in the Eastern District of

4   California Fresno Division have approved hourly rates ranging from $200.00 to $550.00 per hour."

5   *Brewer v. leprino Foods Company*, 2019 WL 3202825 at *4 (E.D. Cal. July 15, 2019); *see also Roach*

6   *v. Tate Publ'g & Enter.*, 2017 WL 5070264 at *9 (E.D. Cal. Nov. 3, 2017) (observing that in 2017,

7   "the current reasonable range of attorneys' fees for cases litigated in the Eastern District of

8   California's Fresno Division [was] between $250 and $400 per hour"). In general, "the highest rates

9   generally reserved for those attorneys who are regarded as competent and reputable and who possess

10  in excess of 20 years of experience." *Silvester v. Harris*, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 17,

11  2014); *see also Freshko Produce Servs. v. Write On Marketing*, 2019 WL 3798491 at *2 (E.D. Cal.

12  Aug. 13, 2019) (finding the requested hourly rate of $350 for an attorney with more than twenty years

13  of experience was "a reasonable hourly rate within the Fresno Division").

14          For attorneys with approximately fifteen years of experience, the hourly rate of $300 is

15  appropriate. *See Trujillo v. Singh,* 2017 WL 1831941 (E.D. Cal. May 8, 2017).  For attorneys with less

16  than ten years of experience," the hourly rates may range between $250 and $325 per hour. *See*

17  *Cervantes v. Vargas,* 2018 WL 2455615, at *7-8 (E.D. Cal. June 1, 2018) (finding $275.00 per hour

18  reasonable for attorney with nine years of experience in litigation); *Mora v. Cal West AG Servs.*, 2019

19  WL 2084725 at *9 (E.D. Cal. May 13, 2019) (awarding the rate of $250 for a first-year associate and

20  $325 to an attorney practicing for nine years). With these parameters in mind, the hourly rates for

21  counsel must be adjusted to those of the local forum.

22          Hours for each of the attorneys who have been admitted to practice for 30 years or more—

23  including Kevin Barnes, Sahag Majarian II, and Dennis Moss—will be calculated at the highest rate of

24  $550 per hour.  The rates for Gregg Lander and Matthew Matern, who have been in practice for more

25  than 20 years, will be adjusted to $400 per hour.  *See Mora*, 2019 U.S. Dist. LEXIS 80520 at *28, 2019

26  WL 2084725 at *9 (adjusting the hourly rate for attorneys who had between 23 and 27 years—the same

27  durations as Mr. Lander and Mr. Matern— to $400 per hour to calculate the lodestar), *adopted by* 2019

28  WL 3760402 (E.D. Cal. Aug. 9, 2019).  Further, the rates for Raphael Katri and Joshua Boxer, who

1   have been practicing for 17 to 18 years, will be adjusted to $350 per hour. *See id.* (awarding the rate of

2   $350 to a partner who had been practicing for 20 years).  Finally, the rate for Nazo Koulloukian, who

3   has been practicing for 11 years, the rate is adjusted to $330 per hour. *See id.* (awarding the rate of $325

4   to an attorney in practice for 9 years for purposes of the lodestar crosscheck).

5           Based upon the prior survey of the attorney fees in the Fresno Division and the Court's own

6   knowledge of prior fee awards, these adjusted hourly rates are reasonable based upon the reported

7   experiences, skill, and reputations of counsel.  *See Brewer*, 2019 WL 3202825 at *4; *Mora,* 2019 WL

8   2084725 at *9; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the

9   district court did not abuse its discretion either by relying, in part, on its own knowledge and

10  experience" to determine reasonable hourly rates).

11              2.      Hours expended

12          Representatives from the law firms designated as Plaintiffs' counsel have provided a declaration

13  including the hours worked in support of the request for attorney fees.  Accordingly, the Court has

14  reviewed the hours reported by each firm to determine whether they are reasonable.

15              a.      The Law Offices of Kevin T. Barnes

16          Kevin Barnes reports that his "law office now has a total of 815.6 attorney hours including the

17  20 hours that [he] expect[s] to spend to prepare for and attend the final approval hearing, contact with

18  class members, contact with the claims administrator and to ensure that proper claims administration

19  and distribution occurs to all class members."  (Doc. 71 at 2, Barnes Supp. Decl. ¶ 5)

20          The tasks performed by counsel from this firm include investigations into Salgado's claims,

21  including meetings with class members; drafting Salgado's complaint, a motion to remand, and motion

22  for class certification; taking depositions; and participation in mediation.  (*See generally* Doc. 71 at

23  19-40)  However, the Court's review of the billing records to determine the tasks undertaken by the

24  law firm revealed the inclusion of clerical tasks, overbilling related to internal communications, and

25  duplicated work, which should have been omitted from the lodestar calculation.

26                      i.      *Clerical tasks*

27          The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at a

28  paralegal or [lawyer's] rate, regardless of who performs them."  *Missouri*, 491 U.S. at 288 n.10.  Thus,

courts have discounted billing entries for "clerical tasks" such as "filing, transcript, and document organization time." *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *see also Harris v. L & L Wings, Inc.*, 132 F.3d 978, 985 (4th Cir. 1997) (approving the court's elimination of hours spent on secretarial tasks from the fees calculation); *L.H. v. Schwarzenegger,* 645 F. Supp. 2d 888, 899 (E.D. Cal. 2009) (finding organizing and updating files were clerical tasks, and declining to award fees where the applicant "tendered no evidence that these are tasks that required the skill of a paralegal"); *Jones v. Metropolitan Life Ins. Co.*, 845 F.Supp.2d 1016, 1027 (N.D. Cal. 2012) (discounting time for "filing or retrieving electronic court documents or copying").  Because Gregg Lander billed 1.0 hour for clerical tasks such as calendaring dates, emails regarding electronic filing, and downloading documents (*See e.g.* Doc 71 at 19-22), the lodestar should be reduced.

<div align="center">

*ii.*    *Internal communications and review of co-counsel's work*

</div>

As noted above, a fee applicant "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. The Ninth Circuit has "recognized that 'the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort.'" *McGrath v. County of Nevada*, 67 F.3d 248, 256 (1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)).  However, in general, counsel should not bill for attending the same meetings, internal communications, and communicating with each other, as such time is unnecessary. *See, e.g., In re Mullins*, 84 F.3d 459, 467 (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F.Supp.2d 1092, 1099 (D. Haw. 2010).

This Court previously observed, "many courts have ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013) (citing, *e.g., Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003) [reducing selected time entries because attorneys "billed an inordinate amount of time for interoffice conferences"]; *see also Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007) ["communication between attorneys may indicate unreasonable overstaffing such that a reduction in hours is appropriate"]). Notably, a review of the billing records from The Law Offices of Kevin T. Barnes reveals a significant amount of time spent on internal communications and meetings.

1    Gregg Lander and Kevin Barnes repeatedly billed time for exchanging emails, drafting internal
2    communications, and attending the same meetings.  For example, on August 29, 2016, Mr. Barnes
3    billed 0.2 hour for drafting emails, while Mr. Lander billed 0.1 hour for his review of the email.  (Doc.
4    71 at 19, 35) On July 5, 2017, Mr. Barnes billed for emailing Mr. Landers regarding the issue of
5    remand, and Mr. Lander billed for his review of the email.  (*Id.* at 19, 36) On September 10, 2018, Mr.
6    Lander billed 2.2 hours related to exchanging emails with Mr. Barnes regarding training related to
7    calling class members during the firm's investigation.  (*Id.* at 24) On January 6, 2019, Mr. Barnes
8    billed 8.9 hours for writing the "class cert brief, emails, [and] memo re additional written discovery."
9    (*Id.* at 37) The same date, Mr. Lander billed 1.1 hours related to email exchanges with Mr. Barnes.
10   (*Id.* at 27) Though these are only a few examples of the written communications between Mr. Lander
11   and Mr. Barnes, the billing records from Mr. Lander include more than 250 entries—each billed at a
12   minimum of 0.1 hour—for emails from or to Kevin Barnes. (*See generally* Doc. 71 at 19-35)
13   However, Mr. Barnes has also billed for drafting these emails.  (*See id.* at 37-41)

14       Mr. Barnes also billed for his review of work performed by co-counsel and meetings with Sahag
15   Majarian and Raphael Katri.  For example, on March 1, 2019, Mr. Barnes billed 3.2 hours for a meeting
16   with Sahag Majarian regarding his case, exchanging emails, and reviewing the complaint.  (Doc. 71 at
17   37)   On July 11, 2019, he billed 0.3 hour for another discussion with Mr. Majarian regarding "his
18   cases," and the following day billed 3.1 hours for reviewing the *Wong* and *Garcia* complaints, and a
19   telephone call with Mr. Lander.  (*Id.* at 38) Mr. Barnes also billed for conferences with Matthew
20   Matern and reviewing the documents Mr. Matern prepared on behalf of Gael Grob. (*Id.*)  Again, though
21   the Court declines to identify each of the meetings and email exchanges between co-counsel, many
22   such entries are found in the timesheets of Mr. Lander, which strongly suggests overbilling. *See*
23   *Gauchat-Hargis*, 2013 WL 4828594 at *3; *Mogck*, 289 F.Supp.2d at 1194; *In re Durosette,* 2012 WL
24   9123382 at *3 (E.D. Cal. Aug. 23, 2012) (finding a reduction of time appropriate in part due to the
25   amount of time reported for preparation of internal memos).

26                    *iii.*    *Overbilling for emails related to electronic filing*

27       Finally, the Court notes that Mr. Lander billed for his receipt of each email generated by the
28   Court's electronic filing system, including for documents filed by his own firm.  From the Court's

33

review, 53 entries in the timesheets from Mr. Lander reference such court emails, billed at a minimum of 0.1 hour—though a handful of these entries are block-billed with internal firm communications. (*See* Doc. 71 at 19-35) Notably, Mr. Lander does not indicate that he reviewed the actual filed documents for which these emails were generated, but only the email from the Court's electronic filing system.  The Court is unable to find all reported time was necessary, as it takes only moments to review a "Notice of Electronic Filing," and not six minutes per email.  *See, e.g., Spectrum Produce Distrib. v. Fresh Mktg*, 2012 WL 2369367 at *8 (D.N.J. June 20, 2012) (finding overbilling where counsel billed "a total of 36 minutes to receive 6 automatically generated messages" from the court's electronic docket because "such separate billing of each task [was] excessive").

### *iv.*     *Reduction in hours billed*

As noted above, Mr. Barnes included 20 hours in his lodestar calculation for anticipated time to preparation for and attendance at the final approval hearing, and future contact with class members and the Settlement Administrator. (Doc. 71 at 2, Barnes Supp. Decl. ¶ 5) The Court declines to award this time, as the motion is taken under submission and will not be held, and the Court will not speculate as to the time that will be expended by counsel on future tasks.  *See Freshko Produce Servs. v. Write On Marketing*, 2019 WL 3798491 at *3 (E.D. Cal. Aug. 13, 2019) (reducing "anticipated fees" from a lodestar calculation where there was "no documentation or explanation regarding time that would be spent enforcing the judgment" and the "declin[ing] to speculate as to the actual time that will be spent").  Thus, the lodestar for Mr. Barnes will be reduced by 20 hours.

Further, given the above concerns related to the inclusion of clerical tasks, the significant amount of time billed for internal communications in the law firm and with co-counsel, and excessive time, the Court exercises its discretion to reduce the hours for Gregg Lander and Kevin Barnes by ten percent for purposes of its lodestar calculation.  *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (the Court has the authority to impose "a small reduction, no greater than ten percent—a 'haircut'—based on its exercise of discretion"); *see also Cosby v. Autozone, Inc.*, 2016 U.S. Dist. LEXIS 55051 at *15 (E.D. Cal. Apr. 25, 2016) (reducing the lodestar calculation by ten percent to account for "excessive and unreasonable" time entries).

With these deductions, the lodestar below reflects deductions in the total amount of 31.68

hours for Mr. Lander and 67.88 hours for Mr. Barnes, which includes the 20 hours for anticipated future tasks, and 47.88 hours from the documented time.  Thus, the total remaining time to be awarded for The Law Offices of Kevin T. Barnes is 716.04 hours.  The Court finds this amount is remaining reasonable for the tasks performed by counsel in this action.

b.       Law Offices of Sahag Majarian II

Mr. Majarian reports that he was approached by David Garcia in November 2015 and Andre Wong in February 2018, and as a result, he has "been involved in the handling of this matter" for "the past fifty months."  (Doc. 62-5 at 5, Majarian Decl. ¶ 8) During this time, he "spent a total of 16.30 hours" on the action.  (*Id.*, ¶ 9) Tasks performed by Mr. Majarian included meetings with the plaintiffs, reviewing records, reviewing the complaints filed on behalf of Garcia and Wong.  (*Id.* at 8-10) Though the reported time also includes drafting emails to co-counsel and meetings with co-counsel, the reported time appears minimal.  (*See id.*)  The Court finds the 16.3 hours billed by Mr. Majarian was reasonable for the completed tasks, and no deductions will be made to the hours he billed.

c.       Koul Law Firm

Nazo Koulloukian reports that he expended 56.0 hours on this action, beginning with the *Wong* action in September 2018.  (Doc. 62-7 at 11; *id.* at 15-18) Tasks performed include:

- Conducting numerous interviews with the named Plaintiff;
- review of documents produced by the Plaintiff;
- preparation of multiple drafts of the PAGA notice letter;
- legal research regarding Defendant's practices;
- preparation and filing of the motion for preliminary approval and order; [and]
- working with Settlement Administrator to ensure compliance with [the] Court's order on preliminary approval.
-

(Doc. 62-7 at 9, Koulloukian Decl. ¶ 14) He also reports, "It is estimated that my office will need to expend at least another 2-5 hours to monitor the process leading up to the final approval."  (*Id.*, ¶ 15)

As set forth above, the Court declines to award estimated future time, particularly without evidence to support the estimates. Accordingly, the "estimated… 2-5 hours" will not be included in the lodestar below.  Although there are many entries indicating conferences and written communications with Sahag Majarian and co-counsel (*see,* Doc. 62-7 at 15-18), the Court notes that the billing for these communications was minimal by Mr. Majarian.  Because the billing for the meetings between co-counsel was not "inordinate," no deduction is necessary. *See Mogck*, 289 F.Supp.2d at 1194.  The

1    Court finds the documented total of 56.0 hours was reasonable by Mr. Koulloukian for the tasks

2    undertaken in *Wong* and after consolidation with this action, and no deduction will be made to the

3    lodestar hours for Mr. Koulloukian.

4                        d.    Law Offices of Raphael A. Katri

5              Mr. Katri reports that his office incurred a total of 52.4 hours as of January 13, 2020, and he

6    expected "to spend approximately 10 hours to prepare for and/or attend the final settlement hearing,

7    contact with aggrieved employees requesting case status updates over the next several months, and to

8    ensure that proper claims administration and distribution occurs to all aggrieved employees."  (Doc.

9    62-3 at 4, Katri Decl. ¶ 6)

10             Notably, of the documented hours, approximately 8 hours involve discussions with co-counsel,

11   without including hours for working with co-counsel on various documents.  As set forth above,

12   records from The Law Offices of Kevin T. Barnes also included billing for communications with Mr.

13   Katri. (*See, e.g.,* Doc. 71 at 19-21, 25, 36) For example, on August 17 and August 30, 2016, Mr. Katri

14   billed a total of 1.1 hour for two calls with co-counsel, and Mr. Barnes billed for teleconferences with

15   Mr. Katri on the same days.  (Doc. 62-3 at 5; Doc. 71 at 36) However, as set forth above, two

16   attorneys cannot bill for attending the same meeting or communicating with one another, as such time

17   is unnecessary. *See In re Mullins*, 84 F.3d at 467; Robinson, 717 F.Supp.2d at 1099.  Accordingly, the

18   Court exercises its discretion to reduce the hours billed by Mr. Katri by ten percent due to the

19   duplication of effort, and to reduce unnecessary time caused by the participation of more than one

20   attorney in prosecuting the claims of Salgado and the class.  *See Moreno*, 534 F.3d at 1111; *Cosby*,

21   2016 U.S. Dist. LEXIS 55051 at *15.  This results in a deduction of 5.24 hours from the lodestar.  The

22   Court finds the remaining 47.16 hours are reasonable in light of the tasks completed by Mr. Katri.

23                        e.    Dennis Moss

24             Dennis Moss reports that his "law office has a total of 59.3 hours" on this action, beginning in

25   December 2015. (Doc. 62-4 at 5, Moss Decl. ¶ 5; *see also id.* at 10) The tasks completed by Mr. Moss

26   include client conferences, research, drafting a complaint, written discovery, deposition preparation,

27   and mediation discussions.  (*See id.* at 10-11) The Court finds the 59.3 hours reported are reasonable

28   for the tasks completed, and no deductions will be made to the hours billed by Mr. Moss for purposes

                                                                 36

1   of calculating the lodestar.

2   <div align="center">f.      Matern Law Group</div>

3   Matthew Matern reports that attorneys Matern Law Group spent 27.3 hours on this action.

4   (Doc. 62-6 at 6, ¶ 10; *see also id.* at 12) This includes 12.5 hours by Mr. Matern and 14.8 hours by

5   Joshua Boxer. (*Id.*) Significantly, however, the attorneys billed for completing *identical* tasks. (*See*

6   Doc. 62-6 at 12) Mr. Matern reports that he spent 3.7 hours on "Law & Motion/ Pleadings;" 4.9 hours

7   on "Attorney-Client Communications/ Research/ Document Review / Correspondence / Meet and

8   Confer / Internal Communications/ Investigation;" and 3.9 hours on "Settlement Negotiations and

9   Drafting of Settlement Documents/ Communications."  (*Id.*)  In addition, he reports that Mr. Boxer

10  spent a total of 14.80 hours on the same activities.

11  Significantly, it is well-established that duplicated tasks should not be included in a lodestar

12  calculation. *See, e.g., Hensley*, 461 U.S. at 434 (indicating a fee applicant "should make a good-faith

13  effort to exclude form a fee request hours that are … redundant"); *Moreno*, 534 F.3d at 112 (observing

14  the Court "may reduce the number of hours awarded because the lawyer performed unnecessarily

15  duplicative work"); *see also Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983) ("If the same task is

16  performed by more than one lawyer, multiple compensation should be denied"); *see also Makaeff v.*

17  *Trump Univ., LLC*, 2015 WL 1579000 (S.D. Cal. Apr. 9, 2015) (excluding time for an attorney whose

18  tasks were "duplicative of other attorneys").  Based on the descriptions provided by counsel related to

19  the tasks completed, the tasks completed by Mr. Matern and Mr. Boxer were identical on this action.

20  Thus, the Court will deduct the hours reported by Mr. Boxer—who has less experience than Mr.

21  Matern—as a duplication.

22  The Court finds the remaining 12.5 hours for Mr. Matern are reasonable in light of the limited

23  work necessary on behalf of Plaintiff Gael Grob, whose case was filed in June 2019, only months

24  before the global settlement of the claims was reached. (*See* Doc. 47-1 at 8)

25  <div align="center">3.      Lodestar Calculation</div>

26  With the hourly rates and time adjustments set forth above, the lodestar for the time expended in

27  this action is $**432,620.00**.

28  *///*

<div align="center">37</div>

| COUNSEL | ADJUSTED HOURS | ADJUSTED RATE | LODESTAR |
|---|---|---|---|
| Kevin Barnes | 430.92 | $550 | $237,006.00 |
| Gregg Lander | 285.12 | $400 | $114,048.00 |
| Raphael Katri | 47.16 | $350 | $16,506.00 |
| Dennis Moss | 59.3 | $550 | $32,615.00 |
| Sahag Majarian II | 16.3 | $550 | $8,965.00 |
| Matthew Matern | 12.5 | $400 | $5,000.00 |
| Joshua Boxer | 0.0 | N/A | N/A |
| Nazo Koulloukian | 56.0 | $330 | $18,480.00 |
|  |  |  |  |
| **TOTAL** |  |  | **$432,620.00** |

### III.    Amount of Fees to be Awarded

There is a strong presumption that the lodestar is a reasonable fee.  *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978.  As a result, "a multiplier may be used to adjust the lodestar amount upward or downward only in rare and exceptional cases, supported by both specific evidence on the record and detailed findings . . . that the lodestar amount is unreasonably low or unreasonably high."  *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000 (internal punctuation and citations omitted).  Nevertheless, the Ninth Circuit observed that the lodestar is "routinely enhanced … to reflect the risk of non-payment in common fund cases."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1300.

The requested fees of $2,400,000.00 would result in a multiplier of approximately 5.55 after the required adjustments to the hourly rates of the local forum and deductions of time expended by Class Counsel.  This multiplier exceeds the range typically awarded in the Ninth Circuit.  *See Vizcaino*, 290 F.3d at 1051 ("multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied").  Also, Class Counsel faced few risks, did not face complicated factual issues, and were not precluded from other work while prosecuting the claims on Plaintiffs' behalf.  The short duration of the professional relationships and lodestar crosscheck also support a downward adjustment from the benchmark.  In light of these factors, a reduction to 20% of the common fund is appropriate.  *See Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value"); *see also Six Mexican Workers*, 904 F.2d at 1311 (awarding "the 25 percent

standard award" where "the litigation lasted more than 13 years, obtained substantial success, and involved complicated legal and factual issues").  The reduction to 20% of the common fund—a total of $1,600,000.00— results in a multiplier of 3.70, which is within the range accepted by the Ninth Circuit.[3]  Accordingly Class Counsel's request for attorney fees is **GRANTED** in the modified amount of 20% of the Settlement fund, or $**1,600,000.00**.

<div align="center">

**REQUESTS FOR COSTS**
</div>

**I.      Litigation Expenses**

In general, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Previously, this Court found costs "including filing fees, mediator fees …, ground transportation, copy charges, computer research, and database expert fees . . . are routinely reimbursed" in class action cases.  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011).

In granting preliminary approval of the Settlement, the Court authorized Class Counsel to seek "expenses up to $70,000."  (Doc. 55 at 22) Class Counsel now request $40,000.58 in costs.  (Doc. 62-1 at 12) Costs incurred include filing fees for the various actions, service of documents, mediation fees, expert fees, copies, and transportation. (*See, e.g.*, Doc. 62-2 at 33; Doc. 62-6 at 14; Doc. 62-3 at 11).  Because the costs incurred by Class Counsel are routinely reimbursed in class actions, and do not exceed the amount previously authorized, the request for litigation costs in the amount of $40,000.58 is **GRANTED**.

**II.     Costs of Settlement Administration**

The Settlement authorizes the Settlement Administrator to receive "reasonable costs of administration" from the Gross Settlement Amount, which was previously estimated to be $56,000.  (Doc. 48-1 at 10, Settlement ¶ 36) However, following the preliminary approval, as discussed above, counsel identified issues with the class member data, which resulted in additional Class Members and additional work performed by the Settlement Administrator to mail revised Class Notices.  (*See* Doc. 71 at 7, Fringer Decl. ¶¶ 8-13)  In addition, the Settlement Administrator had to mail letters to 78

---

[3] Notably, the multiplier of 3.70 also is higher than the multiplier requested by Class Counsel.  (*See* Doc. 71 at 2)

1   individuals to inform them that "based on the revised data, they [were] not a part of the Settlement and

2   were inadvertently sent the Notice of Class Action Settlement." (*Id.* at 8, ¶ 14)  Ms. Fringer reports

3   that following the additional tasks, "[t]he total cost for the administration of this Settlement, including

4   fees incurred and future costs for the completion of the administration is estimated to be $79,887."

5   (*Id.* at 9, ¶ 21) Nevertheless, Class Counsel requests Settlement Administration costs in the amount of

6   $56,000.00 "as expressly stated in the reviewed Class Notice," and indicates additional funds will not

7   be taken from the gross settlement fund.

8          Based upon the information provided regarding the tasks completed by the Settlement

9   Administrator— and the continuing responsibilities with the calculation of the settlement checks,

10  issuance and mailing of those settlement checks, and any necessary tax reporting on such payments—

11  the Court finds the requested Settlement Administration costs are reasonable. Therefore, the request

12  for $56,000.00 for the Settlement Administrator is **GRANTED**.

13                      **CLASS REPRESENTATIVE ENHANCEMENTS**

14         The Settlement provides that Plaintiffs may apply to the District Court for class representative

15  enhancements to be paid from the gross settlement amount.  (Doc. 48-1 at 10, Settlement ¶ 35) In

16  particular, the parties agreed that the payments be $15,000 for Emmanuel Salgado and $5,000 each for

17  David Garcia, Gael Grob, and Andre Wong. (*Id.*)

18         In the Ninth Circuit, a court has discretion to award a class representative a reasonable incentive

19  payment.  *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463.  Incentive

20  payments for class representatives are not to be given routinely.  In *Staton*, the Ninth Circuit observed,

21            Indeed, '[i]f class representatives expect routinely to receive special awards in addition
              to their share of the recovery, they may be tempted to accept suboptimal settlements at
22            the expense of the class members whose interests they are appointed to guard." *Weseley
              v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's
23            Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180
              (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate
24            peace with defendants, grave problems of collusion are raised.").

25  *Id.* at 975.  In evaluating a request for an enhanced award to a class representative, the Court should

26  consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the

27  class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort

28  the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation." *Id.*

at 977.  Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

### A.    Time expended by Plaintiffs

Emmanuel Salgado estimates that he "spent approximately 50 hours on this case," while David Garcia estimates he "spent more that 23 hours on this case." (Doc. 62-8 at 4, Salgado Decl. ¶10; Doc. 62-9 at 4, Garcia Decl. ¶ 14)  Gael Grob estimates she "spent approximately 5-10 hours performing tasks as a proposed class representative."  (Doc. 63 at 2, ¶ 4)  Andre Wong has not provided an estimate of the number of hours he expended as a class representative, reporting only that he "devoted many hours of [his] time to this case."  (Doc. 62-10 at 3, Wong Decl. ¶ 8)

Based upon the information provided, it appears each appointed class representative expended some time related to the action, though the reported amount of time varied.  Therefore, this factor weighs in favor of incentive payments to Plaintiffs.

### B.    Actions taken to benefit the class

The Settlement explains the payments are made to class representatives "in recognition of their efforts and work in prosecuting the Action and Related Actions on behalf of Class Members."  (Doc. 48-1 at 10, Settlement ¶ 35)

Emmanuel Salgado reports that his estimated time included: investigating claims, meeting with his attorneys, "production of documents for discovery," deposition preparation, having his deposition taken, mediation preparation, and attending the full-day mediation. (Doc. 62-8 at 4, Salgado Decl. ¶ 10)  Similarly, David Garcia reports that he reviewed records and complied policies for counsel, met with counsel prior to the filing of his complaint, prepared for a deposition, had his deposition taken, discussions with counsel prior to mediation, and meeting with counsel regarding the settlement.  (Doc. 62-9 at 2-3, Garcia Decl. ¶¶ 4-9)  According to Andre Wong, he "regularly conferenced with [his] attorneys, before and after the filing of the lawsuit, to discuss the status of the case, to offer [his] input on Defendants' practices and policies, to provide names of witnesses, to assist in gathering evidence and documents that supported the PAGA claims, to review policy documents and payroll records from Defendant, and to discuss settlement options."  (Doc. 62-3 at 3, Wong Decl. ¶ 7)  Finally, Gael Grob reports her "tasks as a proposed class representative, include[ed] searching and providing relevant

documents to [her] attorneys, communicating with [her] attorneys regarding the lawsuit, reviewing the settlement documents and discussing the proposed settlement with [her] attorneys, and reviewing and signing [her] declaration in support of the motion for final approval.  (Doc. 63 at 2, Grob Decl. ¶ 4)

Notably, Plaintiffs Salgado and Garcia would have likely submitted to depositions the action was brought on behalf of the class.  In addition, all plaintiffs likely would have assisted with discovery if they had filed individual causes of action.  On the other hand, by reviewing documents and assisting with discovery, their actions undoubtedly benefitted the class. As a result, this factor weighs in favor of class representative incentive payments.

### C.    Fears of workplace retaliation

Notably, each class representative is a *former* employee of Defendants. Any fear of future difficulties with employment due to their status as named plaintiffs is speculative at best.  Thus, this factor does not support incentive payments to Plaintiffs.

### D.    Reasonableness of Plaintiffs' request

Considering the actions taken by Plaintiffs and the time expended, incentive awards are appropriate for the class representatives.  In determining the amount to be awarded, the Court may consider the time expended by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive.  *See, e.g., Ontiveros v. Zamora*, 2014 WL 5035935 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).  Here, considering these factors, the awards requested by Plaintiffs are out of proportion to the efforts taken and time expended.

#### 1.    Time expended

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced

1   evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL

2   1883188 at *11.  Also, the Court noted the plaintiffs "undertook the financial risk that, in the event of a

3   judgment in favor of Defendant in this action, they could have been personally responsible for the costs

4   awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of $7,500 for

5   each plaintiff was appropriate for the time, efforts, and risks undertaken.

6          Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two

7   named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy

8   interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5)

9   and prepared and evaluated the case for mediation, which was a full day session requiring very careful

10  consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the

11  Class." *Bond*, 2011 WL 2648879, at *15.  Similarly, the Northern District determined class

12  representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were

13  involved with the case by interacting with counsel, participating in conferences, reviewing documents,

14  and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*,

15  2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

16         In this case, although the actions of Salgado and Garcia are comparable to the plaintiffs in

17  *Alvarado* and *Bond,* Plaintiffs seeks an award for Salgado that doubles the amount of the incentive

18  awards approved in the other cases. In addition, the actions of Wong and Grob are minimal—and the

19  Court lacks any information regarding the specific amount of time expended by Wong.

20                    2.    Fairness of the hourly rate

21         Recently, this Court criticized a requested award because the award would have compensated

22  the class representative "at a rate of $73.80 per hour." *Ontiveros*, 2014 WL 5035935 at *5-6. The Court

23  explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up

24  for financial risk . . . for example, for time they could have spent at their jobs." *Id.* at *6 (citing

25  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  The Court found an award of

26  "$50 per hour fairly compensate[] the named plaintiff for his time and incorporates an extra incentive to

27  participate in litigation," considering that the plaintiff's hourly flat rate while employed by the

28  defendant was $15 per hour. *Id.* at *6; n. 3.  Nevertheless, the Court increased the award from $13,550

                                        43

1    (calculated with $50 per hour for the 271 hours) to $15,000 because "Mr. Ontiveros relinquished the

2    opportunity to bring several of his own claims."  *Id.* at *6.

3    With the estimated hours, the requested awards would compensate Salgado at the hourly rate of

4    $300, Garcia at the rate of approximately $217 per hour, and Grob between $500 and $1,000 per hour.

5    These hourly rates are clearly excessive.  Indeed, such an award for Grob would exceed the fee

6    awarded to some attorneys on this action.  If the Court were to adopt the hourly rate approved in

7    *Ontiveros*, the incentive awards would be reduced to $2,500 for Salgado; $1,150 for Garcia; and

8    between $250 to $500 for Grob.  The Court is unable to estimate the hourly rate for Wong, as he failed

9    to provide specific information regarding the time expended on his claims or as a class representative.

10   ### 3.    Comparison of the award to those of the Class Members

11   *In Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained

12   counsel, assisted in the litigation, and was an active participant in the full-day mediation."  *Id.*, 2011

13   U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is

14   reasonably close to the average per class member amount to be received."  *Id.*  Here, the requested

15   award for Salgado is more than 25 times the average award Class Members will receive; and the

16   requested payments for Garcia, Wong, and Grob are more than 8 times the average Class Member

17   award.  (*See* Doc. 71 at 8, Fringer Decl. ¶ 20) (reporting the expected average award is $595.29, and the

18   highest settlement share will be approximately $1,629.03).

19   ### E.    Amounts to be awarded

20   Because two of the three factors support an incentive award and Plaintiffs provided assistance

21   to counsel, incentive awards are appropriate.  In light of the efforts and time expended by Emmanuel

22   Salgado—including traveling to and attending the full day of mediation, sitting for his deposition, and

23   assistance with discovery, the Court finds an award of $7,5000 is appropriate. *See Alvarado*, 2011 WL

24   1883188 at *10 (awarding $7,500 to the class representatives). For Daniel Garcia, who expended

25   nearly half the time of Salgado as a class representative and had his deposition taken, but did not

26   attend the mediation, the Court finds the award of $4,000.00 is appropriate.  Finally, incentive awards

27   in the amount of $1,000.00 are appropriate for Andre Wong (who failed to identify any time estimate)

28   and Gael Grob (who expended between 5-10 hours as a class representative), in recognition of their

1 | assistance with discovery, and consent to participate in the global settlement of claims.  *See, e.g. Tellez*

2 | *v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2020 U.S. Dist. LEXIS 23372*26 (S.D. Cal. Feb. 10,

3 | 2020) (declining to award incentive payments in the requested amount of $5,000; and awarding $1,500

4 | to a class representative "spent approximately 10 hours assisting counsel" and $1,000 to

5 | representatives who did not provide an estimate of the time expended on the action).

6 | <center>**CONCLUSION AND ORDER**</center>

7 | Based upon the foregoing, the Court **ORDERS**:

8 | 1.  Plaintiffs' motion for final approval of the Settlement Agreement is GRANTED;

9 | 2.  Certification of the Settlement Class is **GRANTED**, and the class is defined follows:

10 |
11 | > [A]ll persons employed by Defendant in California as hourly-paid, non-exempt employees who worked in retail locations, including but not limited to, Retail Sales Managers, Retail Assistant Managers, Retails Sales Associates, and Mobile Experts, or functionally equivalent positions at any time from February 3, 2013, through the date of Preliminary Approval.
12 |
13 |

14 | 3.  Plaintiff's request for class representative incentive payments is GRANTED in the

15 | amount of $**7,500.00** for Emmanuel Salgado; $**4,000.00** for Daniel Garcia; $**1,000.00**

16 | for Andre Wong; and $**1,000.00** for Gael Grob;

17 | 5.  Class Counsel's motion for attorneys' fees is GRANTED in the modified amount of

18 | $**1,600,000.00**, which is 20% of the gross settlement amount;

19 | 6.  Class Counsel's request for costs in the amount of $**40,005.68** is **GRANTED**;

20 | 7.  Settlement Administration costs in the amount of $**56,000.00** are **APPROVED**, to be

21 | taken from the settlement fund;

22 | 8.  The California Labor Code Private Attorney General Act payment to the State of

23 | California in the amount of $225,000.00 is **APPROVED;**

24 | 9.  The action be dismissed with prejudice, with each side to bear its own costs and

25 | attorneys' fees except as otherwise provided by the Settlement and ordered by the

26 | Court;

27 | 10.  The Clerk of Court is DIRECTED to close this action; and

28 | 11.  The Court hereby retains jurisdiction to consider any further applications arising out of

1    or in connection win the Settlement.

2

3   IT IS SO ORDERED.

4   Dated:   **June 11, 2020**                    **/s/ Jennifer L. Thurston**

5                                          UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28